962 F.2d 660
 35 Fed. R. Evid. Serv. 840
 UNITED STATES of America, Plaintiff-Appellee,
v.
Fred SANDERS, Robert L. Stephenson, Fred J. Tilford, Isaiah
E. Clayton, John A. Carpenter, Phillip M.
Blackman, Everett Gully, Clarence G.
Wilson, Orville Stewart,
Defendants-Appellants.
 Nos. 90-2590 to 90-2602.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 19, 1991.
Decided May 5, 1992.
 
 Joel D. Bertocchi, Asst. U.S. Atty. (argued), United States Crim.Div., Barry R. Elden, Asst. U.S. Atty., United States Crim. Receiving, Appellate Div., Chicago, Ill., for U.S.
 Phillip L. Radmer, Chicago, Ill., for Fred Sanders.
 Patrick T. Driscoll, Jr., Chicago, Ill., for Robert L. Stephenson.
 JoAnne F. Wolfson, Chicago, Ill., for Fred J. Tilford.
 Michael B. Mann, Zavislak & Mann, Hillside, Ill., for Isaiah E. Clayton.
 Richard C. Leng, Leng, Stowell, Friedman & Vernon, Chicago, Ill., for John A. Carpenter.
 Nan R. Nolan, Robinson, Curley & Clayton, Chicago, Ill. (argued), for Phillip M. Blackman.
 Standish E. Willis, Chicago, Ill., for Everett Gully.
 Everett Gully, pro se.
 Paul Bradley, Chicago, Ill. (argued), for Clarence G. Wilson.
 John M. Cutrone, Chicago, Ill., for Orville Stewart.
 Before CUMMINGS and RIPPLE, Circuit Judges, and REYNOLDS, Senior District Judge.*
 RIPPLE, Circuit Judge.
 
 
 1
 This case arises from an FBI sting operation investigating police corruption in Chicago's Second (or "Wentworth") Police District. Defendants/appellants, Fred Sanders, Robert L. Stephenson, Fred J. Tilford, Isaiah E. Clayton, John A. Carpenter, Phillip M. Blackman, Everett Gully, Clarence G. Wilson, and Orville Stewart, were all gamblers or Chicago police officers who participated to varying degrees in a police protection racket. After a two-month jury trial, all were found guilty of racketeering under 18 U.S.C. § 1962(c), and/or racketeering conspiracy under 18 U.S.C. § 1962(d).[1]
 
 
 2
 All nine defendants raise four issues on appeal. First, they contend that the district court violated their constitutional right to an impartial jury when it refused to declare a mistrial after a juror was threatened anonymously and then visited by FBI agents. Second, they allege three errors in the court's handling of the jury instructions: adding an instruction on the coercion defense despite the fact that the defense was never explicitly raised at trial; reinstructing the jury twice with this circuit's Silvern instruction; and supplementing the entrapment defense instructions with the Ninth Circuit pattern jury instruction on the issue. Third, the defendants argue that the Racketeer Influenced and Corrupt Organizations statute's requirement of a pattern of racketeering activity, 18 U.S.C. § 1962(c), is unconstitutionally vague. Fourth, they claim that the district court violated their Sixth Amendment rights when it limited cross-examination of a government witness. In addition, defendant Clarence Wilson separately raises on appeal whether, as a matter of law, he was entrapped into engaging in criminal activity. For the reasons stated below, we affirm all of the convictions.
 
 
 3
 * BACKGROUND
 
 
 4
 The facts of this case are complicated. There were multiple defendants, multiple charges, an FBI sting operation that took place over an eighteen-month period, and a jury trial lasting over two months. However, each of the issues raised on appeal is grounded in a discrete set of relatively simple facts. In the interests of economy and clarity, we shall set out the important facts relating to each claim when that claim is discussed. Nonetheless, a brief overview of the Wentworth investigation is in order.
 
 
 5
 In 1985, the Internal Affairs Division (IAD) of the Chicago Police Department embarked on an investigation of police corruption in the Department's Third District. During the course of this investigation, the Department heard from a gambler, Ricardo Williams, that he was also operating in the neighboring Wentworth district, and that he was paying fifteen to seventeen officers there for protection. After receiving this information, the IAD shifted its focus to corruption in Wentworth. In early 1986, with the help of the FBI, it decided to set up a sting operation in that district. With the cooperation of the district's commander, the IAD and the FBI recruited the district secretary, patrol officer Cynthia White, to pose as a corrupt police officer. Officer White was chosen for this role because the district secretary was traditionally the person through whom a corrupt commander would channel payoffs. Tr. at 373. From March 1986 to September 1987, Officer White orchestrated a "Commander's Club" in Wentworth, through which gamblers and drug dealers in the district supposedly could purchase protection from law enforcement. During this period, she collected numerous bribes, including several from appellants Fred Sanders and Isaiah Clayton, who were local gamblers. She also distributed bribe money to some Wentworth officers, including appellants Robert Stephenson, Clarence Wilson, Fred Tilford, Everett Gully, Phillip Blackman, Orville Stewart, and John Carpenter. Using FBI recording equipment, Officer White taped many of these transactions, as well as other conversations relating to the protection racket.
 
 II
 ANALYSIS
 A. The Juror Threat Issue
 
 6
 In the first of their grounds for appeal, defendants claim that the court erred in not granting them a mistrial after a juror had been threatened anonymously, and then visited by the FBI. They argue that, because of the unique facts of this case and the unusual course of jury deliberations, the trial should have been terminated upon occurrence of the threat. In the alternative, they claim that events subsequent to the threat required the court to conduct a voir dire or a post-trial examination of the jury members in order to determine if the verdict had been improperly influenced. The district court's failure to hold this examination, they assert, was reversible error.
 
 1. Facts
 
 7
 Because defendants base their arguments partially on the unusual course of the jury deliberations, we shall discuss in some detail what happened after the jury retired.
 
 
 8
 After a two-month trial, the eleven-member jury[2] began its deliberations in the late afternoon of Wednesday, January 3, 1990. On the evening of January 3, a Chicago television station aired a tape recording that had been excluded from evidence at trial. The next day, Thursday, January 4, the government requested the court to question the jury on whether any members had seen the tape. The defense objected. Defense counsel was of the view that the jury had been instructed adequately on the matter of extra-courtroom publicity. Tr. at 6266. Nevertheless, the district court granted the motion, ordered the jury back into the courtroom and asked if there was anything the jurors wanted to bring to the court's attention. After a few moments' hesitation, two jurors indicated that they had something to ask the court. The first juror, Juror Matthews, tried to have the court explain the different counts in the indictment. Upon hearing this question, the court cut her off, telling her that she should discuss that question first with the other jurors, and that if she had a question, she should send it to the court in written form. Tr. at 6274-75. The second juror, Juror Layton, told the court that "everybody doesn't agree with the verdict." Tr. at 6275. The court, again, said that that issue was one for the jury, and that the jury must resolve the issue for itself.
 
 
 9
 On Thursday afternoon, January 4, the court received a note from the foreperson of the jury stating that one juror refused to agree to a definition of entrapment. The note concluded with a request for "any assistance in this problem." Tr. at 6300. The court responded by sending back to the jury the Ninth Circuit pattern instruction on entrapment[3] supplemented with the sentences, "Consider all of the evidence. Reread all instructions." Tr. at 6334. Later that afternoon the court received a note from Juror Grimsley stating that he did not believe the government's chief witness and that he could not make a fair decision. The note also contained a request to be dismissed from the case. Tr. at 6343. Upon learning of the note, the defense moved for an immediate mistrial. The court denied this motion, reconvened the jury and read to it the supplemental instruction approved by this court in United States v. Silvern, 484 F.2d 879 (7th Cir.1973) (en banc).[4]
 
 
 10
 Deliberations resumed the next morning, Friday, January 5. Shortly after noon the court received a series of notes from the foreperson complaining of the conduct of one of the jurors. These notes alleged that this juror refused to discuss the law or the case, that he did not have an open mind, and that he was an anarchist. Tr. at 6356-57, 6360, 6362, 6366. In response to these communications, the court inquired by written communication whether the jury could reach a unanimous verdict as to any defendants on any of the counts. A few minutes later, the court received a response from the foreperson stating that only ten jurors could reach a verdict. Tr. at 6370. The court again reconvened the jury and asked each juror individually whether he or she would follow the law as it had been given in the instructions. Each juror replied yes, Tr. at 6377-80, the court reread the Silvern instruction, Tr. at 6389-90, and deliberations resumed.
 
 
 11
 That afternoon, the court received another note from Juror Grimsley indicating that he would vote to acquit the defendants and reiterating his desire to be dismissed from the jury. Tr. at 6393. The court denied his request to be dismissed and instructed the jury to continue to deliberate. Late on Friday afternoon, the court received word that the jury had reached verdicts on two of the defendants. Tr. at 6402, 6409.
 
 
 12
 The jury was dismissed for the weekend at approximately 5:35 p.m. About ten minutes later, one of the jurors, Juror Layton, was standing at the corner of Michigan Avenue and Jackson Boulevard in downtown Chicago--about three blocks from the courthouse--waiting for a bus to take her home. There, an unidentified man approached her from behind, recited her address, and told her to persuade the other jurors "to plead not guilty." Tr. at 6423. The man warned Juror Layton not to turn around, and she did not get a look at him. Upon arriving home, Juror Layton first tried to call the office of the clerk of the district court. When she received no answer there, she called the FBI, which in turn informed the United States Attorney's office of the incident.
 
 
 13
 About 8:30 that evening, an emergency conference call was held between counsel and the court where it was agreed that a hearing would be held the following morning, Saturday, January 6, to investigate the threat. During the course of the conversation, it was discovered that Juror Layton did not have a telephone, and that someone would need to go to her home and inform her personally of the hearing. It is undisputed that the parties agreed that some law enforcement officer would make the call. The defendants claim, however, that they agreed only that representatives of the United States Marshals Service, and not FBI agents, would be sent to meet with Juror Layton. The government disputes that this agreement was ever made. Nonetheless, three FBI agents did go to Juror Layton's home later that evening and informed her of the hearing. The Assistant United States Attorney represented to the court that he "strictly admonished" the agents "that there was nothing else to be said, and no interview or inquiry was to be made." Tr. at 6428. The next morning deputy marshals picked Juror Layton up and transported her to the courthouse.
 
 
 14
 At the hearing, the court interviewed Juror Layton about the threat and the visit from the FBI. She testified that the FBI visit was very brief, and that the agents simply informed her of the hearing and asked her if she felt safe. Ms. Layton gave no indication that she or the agents discussed the ongoing trial. Tr. at 643538. The court then asked Ms. Layton the following questions:
 
 
 15
 THE COURT: Are you able to continue to deliberate as a juror in this case?
 
 
 16
 JUROR LAYTON: Yes.
 
 
 17
 THE COURT: Can you put aside yesterday's events and be fair to both sides in attempting to reach a verdict in this case?
 
 
 18
 JUROR LAYTON: Yes.
 
 
 19
 Tr. at 6441.
 
 
 20
 After Ms. Layton's testimony, the defendants moved for a mistrial, claiming that the threat and the visit from the FBI were unauthorized contacts that violated the defendants' right to an impartial jury. The court denied the motion, reasoning that the trial should be allowed to go forward because Ms. Layton had stated that she could remain fair and had expressed a desire to continue with the case. Tr. at 6449-50. The court also found that the visit from the FBI was "extremely limited" and that there was no indication that the FBI agents who made the call did anything improper. Consequently it declined to declare a mistrial based on that event. Tr. at 6450. Before closing the hearing, the court ordered Ms. Layton not to discuss the threat or the emergency hearing with any other member of the jury. It also ordered her to return for deliberations at 10 a.m. the following Monday, January 8.
 
 
 21
 Despite the court's order, Juror Layton was not present when deliberations were scheduled to resume on Monday morning. At approximately 12:30, when Juror Layton still had not appeared, the court issued an oral search warrant for her apartment. Tr. at 6479-81. Before the warrant was executed, however, Ms. Layton arrived at the courthouse. After defense counsel declined an opportunity to have the court question her on the cause of her absence, she was sent back to the jury room to deliberate. Tr. at 6484-85. The jury deliberated quietly all of Monday afternoon. However, shortly before they were to be sent home for the day, the jury sent a message to the court requesting to leave at 5 p.m. and also asking "to be protected on the way out." Tr. at 6488. The court granted their request with respect to the recess time and arranged with the marshal for the jury to leave by a side exit.[5]
 
 
 22
 At midday on Tuesday, January 9, the defendants moved to voir dire the jury on what they meant when they asked to be "protected," and on their general knowledge of the threat to Juror Layton.[6] While this motion was being argued before the court, the jury announced that it had returned verdicts on all fourteen defendants. The court then refused to voir dire the jury, reasoning that an inquiry after the jury returned a verdict would not serve the ends of justice. Tr. at 6519. Defendants immediately moved for a mistrial. The court offered to poll the jury and ask each member if the verdict was "based upon the evidence and the law given to you by the Court?" Defense counsel refused this offer. Tr. at 6526.
 
 
 23
 The jury returned the following verdicts. Defendants Fred Sanders, Robert Stephenson, and Fred Tilford were found guilty of racketeering conspiracy and acquitted of racketeering. Defendants Phillip Blackman, Isaiah Clayton, John Carpenter, Everett Gully, Clarence Wilson, and Orville Stewart were convicted of both racketeering and racketeering conspiracy. Two defendants, Carnell Jarrell and Harold Allen, were found not guilty on all charges. Three other defendants who are not parties to this appeal, Irene Myers, Curtis Stokes, and Arvell West, were found guilty on all charges. From the special verdict forms used by the jurors, it appears as if the verdicts were reached over several days, with the jury agreeing on five verdicts on Friday, January 5, six on Monday, January 8, and the final three on Tuesday, January 9. United States v. Allen, 736 F.Supp. 914, 921 (N.D.Ill.1990).
 
 
 24
 After the trial, news reports suggested that some of the jurors had learned of the threat to Juror Layton, either through media coverage of the event or from Ms. Layton herself. The defendants then filed a motion for a new trial or to voir dire the jury members on their knowledge of the threat and the effects, if any, that it had on their deliberations. The district court denied this motion on several grounds. First, it reasoned that much of the inquiry that the defendants sought was not allowed under Federal Rule of Evidence 606(b), which forbids a juror from testifying to any matter or statement occurring during the course of deliberations or to the effect of anything upon the jurors' minds or mental processes.[7] Allen, 736 F.Supp. at 916-18. The court then held that such an inquiry would be unhelpful in any event because, even if the jury knew of the contacts, the court found that there was no reasonable possibility that the verdict was influenced by the threat. Id. at 919. The court cited as authority United States v. Bruscino, 687 F.2d 938, 941 (7th Cir.1982) (en banc), cert. denied, 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 and 459 U.S. 1228, 103 S.Ct. 1235, 75 L.Ed.2d 468 (1983), which holds that the trial court can rely on its familiarity with the proceedings when deciding whether a verdict was affected by outside information. It then concluded that numerous facts, including the weight of the evidence, the sequence of the verdicts, and the court's personal assessment of the course of the trial and the conduct of the jury through it, indicated that there was no reasonable possibility that the threat affected the jury verdict. Allen, 736 F.Supp. at 919-22.
 
 2. Guiding principles
 
 25
 The defendants submit that the district court erred in its treatment of their allegations that the jury verdict was prejudiced by outside influences from the threat to Juror Layton and her visit from the FBI. They ask us to assess independently the district court's handling of three separate trial situations: 1) the motion for mistrial upon discovery of the threat; 2) the motion for mistrial upon the district court's denial of a voir dire of the jury on Tuesday, January 9; and 3) the motion for a new trial after the verdict. These contexts are obviously interrelated. Accordingly, we begin by setting forth the principles that must guide our inquiry.
 
 
 26
 It is a fundamental element of due process that a jury in a criminal case be willing to decide the case solely on the evidence before it. Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). Consequently, "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is ... deemed presumptively prejudicial." Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). This presumption is rebutted if the court finds that there was no "reasonable possibility" that the verdict was affected by the contact. United States v. Bruscino, 687 F.2d at 940.
 
 
 27
 Determining whether a verdict was affected is a fact-driven exercise that will depend upon the circumstances of the case. See United States v. Weisman, 736 F.2d 421, 424 (7th Cir.), cert. denied, 469 U.S. 983, 105 S.Ct. 390, 83 L.Ed.2d 324 (1984) ("Each case 'must turn on its special facts ...' ") (quoting Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959)). Factors that a court should look to in making this determination include the extent and nature of the unauthorized contact, the power of curative instructions, and the responses of the jury. United States v. Williams, 737 F.2d 594, 612 (7th Cir.1984), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354-1355, 84 L.Ed.2d 377 (1985). The district court has had first-hand contact with the case and the jury. United States v. Sababu, 891 F.2d 1308, 1333 (7th Cir.1989).[8] Its decision is therefore reviewed according to an "abuse of discretion" standard, and, as an appellate court sitting one step removed from the trial, we shall reverse the district court's decision only if we have a very strong conviction of error. United States v. Bruscino, 687 F.2d at 941; see also United States v. Strickland, 935 F.2d 822, 825 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991); United States v. Best, 939 F.2d 425, 429 (7th Cir.1991) (en banc), cert. denied, --- U.S. ----, 112 S.Ct. 1243, 117 L.Ed.2d 476 (1992).
 
 3. Application to this case
 
 28
 We turn now to the application of these principles to this case. In doing so we shall respond to the parties' arguments with respect to each procedural juncture. Nevertheless, we must emphasize at the outset that each of these trial events is closely tied to the other and, at bottom, an assessment of whether the judgment must be reversed must be based upon an overall assessment of the district court's progressive management of the dynamics of the trial situation.
 
 
 29
 a. the January 6 motion for a mistrial
 
 
 30
 The defendants contend that the district court committed reversible error when it declined to declare a mistrial on Saturday, January 6, immediately following the threat to Juror Layton and the visit from the FBI. They assert that these events, when taken together and interpreted in the light of the turmoil that had occurred during the jury's previous two days of deliberations, were of such overpowering influence that it was impossible for the court to find no reasonable possibility that the verdict was affected. Appellants' Br. at 40. Consequently, defendants argue that the district court's decision to continue the trial was per se error.[9]
 
 
 31
 The government counters by arguing first that the Remmer presumption should not apply to the FBI visit to Juror Layton. It submits that the visit was agreed to by the parties and thus was not "unauthorized" for the purposes of Remmer's analysis. Govt.Br. at 33-35. It next argues that the district court's investigation of the threat in the emergency hearing and the testimony that it heard from Juror Layton gave it an adequate basis to determine that the verdict was not affected by that incident. Therefore, the court did not abuse its discretion in ordering the trial to continue. Govt.Br. at 30-35.
 
 
 32
 With regard to the FBI visit, we agree that that event did not require the court to declare an immediate mistrial. The parties strongly dispute whether they agreed to send FBI agents, rather than deputy United States marshals, to Juror Layton's home. The facts then are not as clear as the government paints them and it is not entirely clear whether the contacts were "authorized," and thus outside of the Remmer analysis. Nonetheless, even if Remmer does apply, it cannot be said that circumstances of the visit compelled the court to declare a mistrial. The record establishes that the visit lasted only a few minutes, that the agents who called did not testify or otherwise appear at the trial, and that the only subjects that were discussed were the hearing the next morning and whether Juror Layton feared for her personal safety. All indications are that this visit was short and innocuous, and we believe that the district court could conclude that there was no reasonable possibility that it would affect the outcome of the trial.
 
 
 33
 We turn now to the threat to Juror Layton and its effects on the jury. Certainly, this was a serious matter and one that required the careful attention of the district court. However, we do not believe that, on the information available to the court on Saturday, January 6, it was an abuse of discretion to allow the trial to continue. As outlined above, on the morning after the threat, the court convened an emergency hearing. It heard testimony from Juror Layton and the attorneys about the threat and subsequent events. Juror Layton explicitly testified that she could put this incident behind her and continue to serve impartially as a juror. Because of this explicit testimony and the careful inquiry of the district court, we are unable to say that the district court abused its discretion in accepting Juror Layton's sworn statements and allowing the trial to continue.[10]
 
 
 34
 The defendants claim that the turmoil of the previous two days of deliberation mandated an immediate mistrial when the threat and the subsequent FBI visit took place. Several factors counsel against such a conclusion. First, no one contends that these events were in any way related to the earlier problems in the jury room, or even that the same jurors were involved in the two incidents. Second, the jury deliberated quietly for all of the afternoon of Friday, January 5, and late in the day informed the court that it had reached verdicts on two defendants.[11] Indeed, the jurors asked permission to stay later that day in order to finish up what they were doing. Tr. at 6412. The district court reasonably could have interpreted this turn of events as suggesting that, by Friday afternoon, the jury had put the problems of the previous days behind it and was working diligently at reaching verdicts. The district court reasonably could have determined that the first two days of deliberations did not leave the jury particularly vulnerable to taint, and did not require an automatic mistrial after the threat occurred.
 
 
 35
 b. the pre-verdict voir dire
 
 
 36
 Defendants next contend that the court erred in not granting their motion on Tuesday, January 9, to voir dire the jury. The defendants made this motion at midday on the 9th, after the threat to Juror Layton had received coverage in the Chicago media, after Juror Layton appeared late for deliberations on the 8th, and after the jurors had asked the previous afternoon for protection on their way out of the courthouse. While the court was hearing argument on this motion, the jurors announced that they had reached a verdict. In the wake of this news, the district court denied the motion, but did offer to poll each jury member and ask whether his or her decision was based on the evidence and the law given by the court. The defendants refused this offer.
 
 
 37
 The defendants contend that the late arrival of Juror Layton and the jury's request for protection indicated that the entire jury had somehow learned of the threat, either through media reports or from Juror Layton herself. They then argue that, under our decisions in United States v. Trapnell, 638 F.2d 1016, 1022-24 (7th Cir.1980), and United States v. Williams, 737 F.2d 594, 612 (7th Cir.1984), cert. denied, 470 U.S. 1003, 105 S.Ct. 1354, 1355, 84 L.Ed.2d 377 (1985), the court was required to conduct a voir dire inquiry of the entire jury to determine if they had been affected by this knowledge. Appellants' Br. at 41-43. In response the government argues, essentially, that the defendants were too late with their motion because they introduced it at roughly the same time that the jury reached its verdict. The government also claims that the court has broad discretion to deal with possible juror contacts and that the court need not conduct a voir dire every time the jury may be exposed to potentially prejudicial information. Govt.Br. at 36-39.
 
 
 38
 "A district court 'has broad discretion to remedy prejudicial influences' " on a jury. United States v. Sababu, 891 F.2d 1308, 1334 (7th Cir.1989) (quoting United States v. Williams, 737 F.2d at 613); United States v. McAnderson, 914 F.2d 934, 944 (7th Cir.1990). However, when presented with reports of prejudicial publicity, a district court is required under Margoles v. United States, 407 F.2d 727, 735 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969), and Trapnell to inquire of the jurors about their knowledge, if any, of the reports. United States v. Thomas, 463 F.2d 1061, 1063-64 (7th Cir.1972).[12] The fact that the jury returns a verdict while the court is hearing a motion does not relieve it of this obligation. Id. at 1064. Accordingly, we must determine whether, given the procedural context in which the issue arose, the district court adequately fulfilled its responsibility.
 
 
 39
 We begin with the general principles that must guide the trial court's inquiry. The defendants accurately cite Trapnell for the procedure to be used when prejudicial publicity occurs during a criminal trial:
 
 
 40
 [T]he procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he had read or heard any of the publicity in question, the judge is not required to proceed further.
 
 
 41
 Trapnell, 638 F.2d at 1022 (quoting Margoles v. United States, 407 F.2d at 735); United States v. Bates, 852 F.2d 212, 219 (7th Cir.1988) (collecting cases). The purpose of this procedure is two-fold. Margoles, 407 F.2d at 734. First, it allows the court to determine if the jurors, in fact, learned of the prejudicial information. Second, if they did know, this procedure allows the court to determine if the jury is, and can remain, impartial. In determining impartiality, the court should look to "factors such as the communication's nature, the jurors' responses, and the curative ability of instructions." Williams, 737 F.2d at 612 (citations omitted).
 
 
 42
 Trapnell does not require a full voir dire of the jury every time it may have learned of prejudicial information. Instead, that case and related cases make clear that the first responsibility of the district judge is to determine "if any jurors who had been exposed to such publicity had read or heard the same." Trapnell, 638 F.2d at 1022.[13] It is only when a juror admits to exposure to this publicity that a voir dire is required. Id. This two-step analysis is tailored to the delicate task before a trial judge faced with the possibility of such infection of the deliberative process. If voir dire were not limited to only those cases where it has been shown that the jurors knew of the improper information, the court would almost necessarily inform innocent jurors of this information during an inquiry into its effect on their deliberations. Here, the jury had concluded its deliberations and, arguably, the two-step process was not as essential as it would have been at an earlier stage of the proceeding. However, the focus of our inquiry is not on whether the district court could have handled the matter in another way. Rather, we must determine whether the chosen course was an inadequate response to its responsibility under Trapnell.
 
 
 43
 The defendants contend that "clear evidence of jury exposure to outside influence" required the district court skip to the second part of the Trapnell process and voir dire each member of the jury on the extent and effects of this knowledge. Appellants' Br. at 43-44. However, the record shows that at the time of the court's decision it was by no means clear that the other jurors had learned of what had happened to Juror Layton. The jury had been repeatedly instructed to avoid media coverage of the trial. Also, the messages that the jury sent to the district court did not lead inescapably to the conclusion that the jury knew of the threat. Indeed, the district court believed that the jury's request to be protected on the way out of the courthouse--a cornerstone piece of evidence in the defendants' argument that the jurors knew--referred to protection from the media, rather than protection from danger. Tr. at 6490. Under these circumstances, we cannot say that the court erred when it decided to limit its initial inquiry into whether the jurors had been exposed to the threat. It offered to poll the jurors and ask if their verdict was based on the evidence and the law. The defendants refused this offer. Under these circumstances, we cannot say the district court abused its discretion in declining to make any further inquiry.
 
 
 44
 Moreover, even if the court had erred in refusing to conduct a voir dire "failure to follow the procedure is not automatically reversible error.... The ultimate inquiry is whether there is any substantial likelihood that the defendants were denied a fair trial." United States v. Balistrieri, 779 F.2d 1191, 1214 (7th Cir.1985), cert. denied, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986). As will be discussed immediately below, the facts of this case indicate that there was no reasonable possibility that the verdicts were tainted by the threat to Ms. Layton.
 
 
 45
 c. the motion for a new trial
 
 
 46
 Finally, after news reports indicated that some of the jurors had learned of the threat during deliberations, the defendants filed post-trial motions for a new trial or to question the jurors about the incident's effects. The court denied these motions, and the defendants claim reversible error. For the purposes of deciding this motion, the district court assumed that the jurors had learned of the threat. Allen, 736 F.Supp. at 919. Nonetheless, it found that, despite this fact, the evidence at trial and the conduct of the jury indicated that there was no reasonable possibility that the verdicts were affected. Id. at 922. The defendants contend that the court could not have reached this conclusion without asking the jurors whether they discussed the threat and whether they attributed the threat to the defendants. In response the government argues that questioning the jurors would have been unnecessary in this situation because the weight of the evidence and the course of the jury's deliberations support the conclusion that there was no reasonable possibility of influence.
 
 
 47
 We believe that the court did not err in finding, without questioning the jurors, that there was no reasonable possibility that the verdict was influenced. We note first that any post-trial inquiry would have been severely restricted by Federal Rule of Evidence 606(b). As we have recently held:
 
 
 48
 Rule 606(b) of the evidence rules, far from giving a judge carte blanche in questioning a jury about its verdict, forbids him to inquire into the jurors' beliefs, opinions, discussions, grounds, etc., save as necessary to determine the existence and content of any unauthorized communication made to the jury. The proper procedure therefore is for the judge to limit the questions asked the jurors to whether the communication was made and what it contained, and then, having determined that the communication took place and what exactly it said, to determine--without asking the jurors anything further and emphatically without asking them what role the communication played in their thoughts or discussion--whether there is a reasonable possibility that the communication altered their verdict.
 
 
 49
 Haugh v. Jones & Laughlin Steel Corp., 949 F.2d 914, 917 (7th Cir.1991).[14] While Rule 606(b) would have allowed the jurors to testify whether they had learned of the threat,[15] it would have prevented a juror from testifying "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror." Fed.R.Evid. 606(b); see also Wiedemann v. Galiano, 722 F.2d 335, 337 (7th Cir.1983) (Rule 606(b) "prohibits jurors from giving post-verdict testimony as to whether their deliberations, in fact, were prejudiced by ... extraneous information or outside influence."). Rule 606(b) would almost certainly have insured that questioning the jurors would not have revealed much more than what the court assumed: that the jurors knew of the threat during their deliberations.
 
 
 50
 Our review of the district court's finding of no influence is limited to determining if it was an abuse of discretion. Bruscino, 687 F.2d at 940-41. In conducting this review, we are mindful of this court's observation that "[t]he trial judge will always be in a better position than the appellate judges to assess the probable reactions of jurors in a case over which he has presided." Id. at 941. The district court based its conclusion that there was no reasonable possibility of prejudice on a number of different factors. First, it noted that the evidence against the defendants was "overwhelming," and that much of it came from the defendants' own mouths in the form of video and audio recordings. Allen, 736 F.Supp. at 919-20. Second, the court pointed out that the jury had been repeatedly admonished to make its decision based on the evidence, and had been warned to disregard press reports and all other outside sources of information about the trial. Id. at 920-21. Third, because the jury dated the verdict forms, it was revealed that the jury reached verdicts both before and after the threat, and that certain defendants were acquitted of certain counts after the threat occurred. Id. at 921-22. In the court's view, this sequence of verdicts "would not support a finding that this jury was irrational, controlled by emotion, passion, fear or any other improper influence." Id. at 922. Finally, the court cited its own assessment of the conduct of the jurors during the trial. The court remarked that the jurors were "attentive" and that "[t]here was no observable indication of trepidation, reaction to public interest, or untoward pressure or tension." Id.
 
 
 51
 After reviewing the record and the careful and thorough analysis of the district court, we cannot say that it abused its discretion in finding that "[t]he jury was both 'capable and willing' to decide this case solely upon the evidence properly before it." Id. All the defendants before this court admit that they either accepted or paid bribes and, from our independent review of the record, we cannot disagree with the district court's conclusion that the evidence at trial was "overwhelming." Also, we are impressed by the fact that the jury rendered its verdicts both before and after the threat, and that it acquitted defendant Stephenson of his racketeering charge on Monday, January 8, and defendant Tilford of the same charge on Tuesday, January 9. We agree with the district court that this sequence of verdicts supports a conclusion that the jury approached its responsibilities with discernment and care, not with emotion or vindictiveness. In conclusion, after thorough examination of the record and assessment of the proceedings in their totality, we conclude that the court acted appropriately in managing the difficult situation it faced following the threat to Juror Layton. We hold that the court did not abuse its discretion when it refused to declare a mistrial.
 
 B. The Jury Instruction Issues
 
 52
 All nine appellants next challenge the district court's handling of the jury instructions. They allege first, that the court erred in giving an instruction on the coercion defense and allowing the prosecution to discuss this defense during closing argument. Second, they contend that the court erred when, after the jury indicated that it was having trouble coming to a verdict, it declined to declare a mistrial and, instead, twice read to the jury the "Silvern instruction." Third, the defendants argue that the court erred when it reinstructed the jury on entrapment with the Ninth Circuit pattern instruction on that issue.
 
 1. Facts
 
 53
 At the close of evidence, the government proposed to include within the jury instructions an instruction on the defense of coercion. Although the defendants did not technically raise the coercion defense, but instead argued entrapment, the government asserted that the defendants continually suggested that they entered the criminal scheme against their will. Consequently, a question of coercion may have existed in the jurors' minds, and they should be instructed on the requirements of that defense. The court agreed, and included a coercion instruction, which it gave immediately after an instruction on entrapment.[16] The prosecution also argued the nonexistence of coercion in its closing argument, over defense objections.
 
 
 54
 The jury instructions also contained this circuit's "Silvern instruction," which derives its name from the decision in which it was first announced, United States v. Silvern, 484 F.2d 879 (7th Cir.1973) (en banc). This instruction, which is meant to counter juror deadlock, United States v. Hamann, 688 F.2d 507, 511 (7th Cir.1982), cert. denied, 460 U.S. 1013, 103 S.Ct. 1255, 75 L.Ed.2d 483 (1983), instructs jurors on their role as fact-finders and on the requirement that any verdict they reach be unanimous. The court later read this instruction two more times on Thursday, January 4, and Friday, January 5, after the jurors indicated that one of its members was having difficulty agreeing to a verdict.[17]
 
 
 55
 As noted above, the court also instructed the jurors on the defense of entrapment.[18] On Thursday, January 4th, the jury indicated that one of its members was having difficulty understanding the defense and asked the court for help. In response, the court sent back to the jury room a copy of the Ninth Circuit pattern instruction on entrapment supplemented with the sentences, "Consider all of the evidence. Reread all instructions."[19] The Ninth Circuit instruction is substantially similar to the Seventh Circuit instruction except in one respect: at one point, the Ninth Circuit instruction states that the defense of entrapment is not available to any defendant who had a "previous intention to violate the law." The Seventh Circuit instruction states that the defense is unavailable to any person who has "had [a] prior intent or predisposition to commit the offense charged."
 
 2. Analysis
 
 56
 a. including the coercion instruction
 
 
 57
 The defendants argue that the court erred in adding the coercion instruction, and allowing the government to argue the lack of coercion. They assert that allowing this issue to be injected into the trial unnecessarily confused the jury, and created the substantial risk that it would apply the strict standards of the coercion defense to their entrapment argument. We disagree. An instruction is appropriate if it addresses " 'an issue reasonably raised by the evidence.' " United States v. Valencia, 907 F.2d 671, 679 (7th Cir.1990) (quoting United States v. Talkington, 875 F.2d 591, 595-96 (7th Cir.1989)); see also United States v. Diaz, 864 F.2d 544, 549 (7th Cir.1988), cert. denied, 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). "In reviewing the decision of a district court to give the instruction, we must review the evidence and any reasonable inference from that evidence in the light most favorable to the government." Talkington, 875 F.2d at 596; United States v. Bigelow, 914 F.2d 966, 970 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1077, 112 L.Ed.2d 1182 (1991). In this case, a number of defendants argued that they did not enter this crime scheme willingly, but instead joined out of fear of what would happen to their police careers or illegal operations if they did not participate. This pressure did not amount to coercion as a matter of law. However, it may have raised a question about coercion in the jury's mind, and it was not error to address possible doubt on this issue through an instruction on coercion's legal requirements.
 
 
 58
 b. rereading the Silvern instruction
 
 
 59
 The defendants bring a two-part argument to support their assertion that the court erred in reading the Silvern instruction to the jury on Thursday, January 4, and Friday, January 5. They first claim that the jury was "hung" or "deadlocked" on those dates. They then argue that, within the "extraordinary and unique" circumstances of this trial, the court's decision not to declare a mistrial, and instead to read the instruction, had the effect of coercing the jury into rendering a verdict. Appellants' Br. at 51.
 
 
 60
 We do not agree that the court coerced the jury. With regard to the argument that the court should have declared a mistrial upon learning of the jury's difficulties, we note that "[t]he district court has broad discretion with regard to declaring mistrials." Our review is limited to whether the denial was an abuse of discretion. United States v. Beverly, 913 F.2d 337, 351 (7th Cir.1990), aff'd, --- U.S. ----, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). Despite the defendants' contentions, it is not at all clear that the jury was deadlocked when the court denied the mistrial motions and, instead, reinstructed. Cf. United States v. Kramer, 955 F.2d 479, 488-89 (7th Cir.1992) (finding no error in declining to declare a mistrial despite several messages from jury stating that it was deadlocked); Beverly, 913 F.2d at 351 (no error in declining to declare a mistrial despite note from jury stating that it could not reach a verdict and that "[g]oing beyond this point might involve intimidation."). The court could reasonably have attributed the jury's difficulties to individual, temporary recalcitrance to follow its instructions. Also, when the court denied these motions, the jury had been deliberating less than two days. Given the length of the trial and the number of defendants, the court could have reasonably concluded that the jury did not reach deadlock after such a short time at work. See id. (no error in failing to declare mistrial when jury announced deadlock after only two days' deliberation).
 
 
 61
 With regard to the claim that reading the Silvern instruction had a coercive effect on the jury, we have recently noted that "[t]he relevant inquiry, under Silvern, ... is 'whether "the court's communications pressured the jury to surrender their honest opinions for the mere purpose of returning a verdict." ' " Kramer, 955 F.2d at 489 (quoting United States v. Thibodeaux, 758 F.2d 199, 203 (7th Cir.1985) (quoting United States v. Hamann, 688 F.2d 507, 511 (7th Cir.1982), cert. denied, 460 U.S. 1013, 103 S.Ct. 1255, 75 L.Ed.2d 483 (1983)). We have previously described the Silvern instruction as " 'perfectly content-neutral and [carrying] no plausible potential' " for coercing the jury. Beverly, 913 F.2d at 352 (quoting United States v. D'Antonio, 801 F.2d 979, 983-84 (7th Cir.1986)). While, as the government admits, multiple repetitions of this instruction could conceivably overbear a jury's independence, that did not occur in this case. After it was read in the initial jury charge, the court repeated the instruction only two times over two days. Cf. United States v. Byrski, 854 F.2d 955, 962 n. 11 (7th Cir.1988) (noting that the district court has discretion to repeat the Silvern instruction twice). We do not believe that the district court abused its discretion by rereading the Silvern instruction. Beverly, 913 F.2d at 352.
 
 
 62
 c. the Ninth Circuit entrapment instruction
 
 
 63
 The final challenge that the defendants bring to the jury instructions centers on the court's decision to reinstruct the jury with the Ninth Circuit's pattern instruction on entrapment. They argue that the Ninth Circuit's instruction misstated the law because it directs that the entrapment defense is not available to a person who has a previous intent "to violate the law." This statement, the defendants claim, is "radically different" from the Seventh Circuit's formulation that the defense is not available to a defendant who has the intent "to commit the offense charged." Appellants' Br. at 59. The defendants claim that this difference limited the availability of the entrapment defense, particularly to the gambler defendants Clayton and Sanders, who admitted that they had the intention to violate the law by their gambling activity, but who did not necessarily have the intention to violate RICO or to commit RICO conspiracy.
 
 
 64
 " 'The necessity, extent, and character of any supplemental instructions to the jury are matters within the discretion of the district court.' " United States v. Franco, 874 F.2d 1136, 1143 (7th Cir.1989) (quoting United States v. Castenada, 555 F.2d 605, 611 (7th Cir.), cert. denied, 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977)). "Once it is clear that a jury has difficulties concerning the original instructions, reinstruction is appropriate." United States v. Cheek, 882 F.2d 1263, 1268 (7th Cir.1989), vacated on other grounds, --- U.S. ----, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); Beverly, 913 F.2d at 357. The court's power to reinstruct includes within it the power to reformulate or supplement the instruction. See Franco, 874 F.2d at 1143; United States v. Penson, 896 F.2d 1087, 1090 (7th Cir.1990) ("substantial discretion is given to the trial court with respect to the specific wording of the instructions"). Among the factors to be examined when determining if a supplemental instruction was an appropriate exercise of the district court's discretion are (1) if the instructions as a whole fairly and adequately treat the issues; (2) whether the instructions are a correct statement of the law; and (3) whether the district court answered the jury's question specifically. Franco, 874 F.2d at 1143; Cheek, 882 F.2d at 1268. "It is axiomatic that in determining the propriety of an instruction that all the instructions be considered as a whole." United States v. Johnson, 605 F.2d 1025, 1027 (7th Cir.1979) (en banc), cert. denied, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980).
 
 
 65
 Here, defendants challenge only one small phrase in the Ninth Circuit instruction; they do not object to any other aspect of the instruction nor do they claim that the Seventh Circuit instruction is incorrect. We cannot say that the court abused its discretion in giving it, particularly when the instruction is read as a whole and together with the Seventh Circuit's instruction. It is true that the Ninth Circuit instruction does state that the entrapment defense is available to a person who "has no previous intention to violate the law." This language is less precise than our instruction. However, any prejudicial effects of this statement were substantially lessened by the statement two sentences later that the entrapment defense is unavailable to a defendant who was "willing to commit a crime like the one charged in the indictment." This language is essentially the same as the Seventh Circuit's instruction that a defendant who had "a prior intent or predisposition to commit the offense charged" could not claim entrapment. Any possibility of prejudice to the defendants was further limited by the court's careful instruction to the jury that it was to "reread all instructions."
 
 C. Vagueness Challenge to RICO
 
 66
 Defendants next argue that the Racketeer Influenced and Corrupt Organizations statute's requirement of a "pattern of racketeering activity," 18 U.S.C. § 1962(c), is unconstitutionally vague because it does not give fair warning of the conduct that it criminalizes. This court has recently addressed and rejected vagueness challenges to RICO in United States v. Masters, 924 F.2d 1362, 1367 (7th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991), and United States v. Glecier, 923 F.2d 496, 497-98 n. 1 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). Principles of stare decisis require us to adhere to these earlier rulings.
 
 
 67
 D. Cross-Examination of Assistant United States Attorney Peters
 
 
 68
 Finally, all nine defendants challenge the trial court's management of the cross-examination of government witness Victoria Peters. They argue that the limited ability that they had to cross-examine Ms. Peters about her biases and prejudices violated their Sixth Amendment rights.
 
 1. Facts
 
 69
 At trial, the government's case against the defendants centered on the testimony of Officer Cynthia White and approximately one hundred audio and videotaped conversations which Officer White had secretly recorded. Verbatim transcripts of these taped conversations were also prepared under Officer White's direction. At trial Officer White's testimony was used to authenticate these taped conversations and verbatim transcripts, and the tapes and transcripts were admitted into evidence in their entirety. During the course of the trial, the government played extracts from these taped conversations and also made available to the jury edited versions of the verbatim transcripts that corresponded to the extracts that were played. Assistant United States Attorney Victoria Peters directed the preparation of these extracts.
 
 
 70
 Prior to the testimony of Officer White, the government called as a witness Ms. Peters for the purpose of authenticating the tape extracts and the edited transcripts. Some limited cross-examination of Ms. Peters took place. However, when defense attorneys began to inquire into the composition of the full tapes and transcripts, the court ended cross-examination and excused the witness. The court justified its decision on the grounds that Ms. Peters was called only for the limited purpose of authenticating the edited tapes and transcripts, and that questions concerning the authenticity of the full tapes and transcripts from which they were made would be answered by Officer White. The court ruled that full cross-examination of Ms. Peters by all defendants would needlessly consume time, and it invoked its authority under Federal Rule of Evidence 611(a) to terminate cross-examination.[20]
 
 2. Analysis
 
 71
 Defendants argue that the court's termination of the cross-examination of Ms. Peters unconstitutionally limited their ability to examine adverse witnesses. In particular, they argue that the court's action limited their Sixth Amendment right to delve into the biases and prejudices that might have colored Ms. Peters' testimony.
 
 
 72
 " '[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " Delaware v. Van Arsdall, 475 U.S. 673, 678-79, 106 S.Ct. 1431, 1434-35, 89 L.Ed.2d 674 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 316-17, 94 S.Ct. 1105, 1110-11, 39 L.Ed.2d 347 (1974)). However, "[i]t is well-established that the Sixth Amendment only guarantees the defendant the opportunity for effective, not limitless, cross-examination." United States v. Aguilar, 948 F.2d 392, 397 (7th Cir.1991). Consistent with the Sixth Amendment, the court may reasonably limit cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679, 106 S.Ct. at 1435; United States v. Muhammad, 928 F.2d 1461, 1466-67 (7th Cir.1991). In this case, we cannot say that the court erred in limiting cross-examination of Ms. Peters. She was called only to authenticate portions of tapes and transcripts; the full tapes and transcripts would be authenticated by Officer White. Further cross-examination of Ms. Peters' biases would not have advanced materially the truth-seeking function of the trial. Notably, defendants do not identify in their brief any prejudice or disadvantage which they suffered because they were limited in their ability to examine her.
 
 E. Clarence Wilson's Entrapment Claim
 
 73
 Defendant Clarence Wilson raises as a separate issue on appeal whether, as a matter of law, he was entrapped by the government into engaging in criminal activity. Mr. Wilson, a Chicago police officer in the Wentworth district, was convicted of racketeering and racketeering conspiracy. He admits that he committed willingly one criminal act--delivery of a $1400 payoff to Officer White from his cousin and co-defendant, the gambler Fred Sanders. He also admits that he accepted at least eight $350 bribes, and that he introduced Officer White to the gambler John Rodgers for the purpose of making him a customer of the protection racket. However, he claims that he accepted the bribes and introduced Rodgers only after being strongly pressured by Officer White, and that this pressure entrapped him as a matter of law into committing these acts. He also asserts that because these acts were the product of entrapment, and therefore could not be considered at trial, the government could not prove sufficient facts to support his racketeering and racketeering conspiracy convictions.
 
 
 74
 In order to establish entrapment at trial, the defendant must bring forward evidence both that he was induced by the government to commit the crime and that he was not predisposed to engage in the criminal conduct. United States v. Jones, 950 F.2d 1309, 1314 (7th Cir.1991); United States v. Rivera-Espinoza, 905 F.2d 156, 158 (7th Cir.1990). If the defendant makes this showing, the burden then shifts onto the government to prove beyond a reasonable doubt either that there was no inducement or that the defendant was predisposed to commit the offense. United States v. Blackman, 950 F.2d 420, 423 (7th Cir.1991); Rivera-Espinoza, 905 F.2d at 158. "Therefore, while the defendant must present evidence of both elements, the government can defeat the entrapment defense by proving beyond a reasonable doubt either the absence of government inducement or the defendant's predisposition." Blackman, 950 F.2d at 423. Mr. Wilson is raising this challenge on appeal, after a full trial on the merits. A jury found no entrapment. In this situation, he bears an extremely heavy burden; we shall affirm the jury's verdict if any rational trier of fact could have found either predisposition or no inducement beyond a reasonable doubt. United States v. Beverly, 913 F.2d at 355.
 
 
 75
 Here, Mr. Wilson argues, in part, that he was not predisposed to engage in criminal activity, but did so only under pressure from Officer White. We have previously identified a number of factors that are relevant to determining whether a defendant was predisposed to commit a crime, including:
 
 
 76
 (1) the character and reputation of the defendant, including any previous criminal record; (2) whether the suggestion of the criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant expressed reluctance to commit the offense which was overcome only by repeated government inducement or persuasion; and (5) the nature of the inducement or persuasion applied by the government.
 
 
 77
 Rivera-Espinoza, 905 F.2d at 157-58. "The most important factor for the court to focus upon is the defendant's reluctance to commit the offense." Jones, 950 F.2d at 1314. In light of these factors, we believe that there is sufficient evidence in the record to allow the jury to find beyond a reasonable doubt that Mr. Wilson was predisposed to commit his offenses. First, Mr. Wilson admits that he committed his first criminal act, delivering the bribe, of his own volition. Also, Officer White testified that Mr. Wilson promised to be responsible for delivering monthly bribes from Fred Sanders. Tr. at 1330-31. In one tape Mr. Wilson is heard vouching that John Rodgers will be a reliable customer of the ring. Tr. at 2384. Also, Mr. Wilson concedes that he accepted monthly bribes from November 1986 until September 1987. And testimony exists in the record that Mr. Wilson wished to work the third watch, from approximately 3 p.m. to 11 p.m., in order to "look out for [Fred Sanders'] operation." Tr. at 1336. From these facts the jury could have concluded that Mr. Wilson had a predisposition to take part in the illegal scheme. The jury's finding of no entrapment therefore must stand. This result is quite compatible with the recent holding of the Supreme Court in Jacobson v. United States, --- U.S. ----, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992). Here, "the ready commission of the criminal act amply demonstrates the defendant's predisposition." Id. at ----, 112 S.Ct. at 1541.
 
 CONCLUSION
 
 78
 For the foregoing reasons, we affirm the convictions of the defendants.
 
 
 79
 AFFIRMED.
 
 
 
 *
 The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 Defendants Carpenter, Clayton, Wilson, Gully, Stewart, and Blackman were convicted of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and also of racketeering, in violation of 18 U.S.C. § 1962(c). Defendants Sanders, Stephenson, and Tilford were found guilty only of racketeering conspiracy
 
 
 [2]
 Late in the trial one of the jurors was dismissed. All of the defendants currently before this court waived their right to a twelve-member jury and the trial continued with eleven jurors. Tr. at 5723-25
 
 
 [3]
 The text of this instruction is reprinted below at note 19
 
 
 [4]
 The instruction the court read is as follows:
 The verdict must represent the considered judgment of each juror. Your verdict, whether it be guilty or not guilty, must be unanimous. You should make every reasonable effort to reach a verdict. In doing so, you should consult with one another, express your own views, and listen to the opinions of your fellow jurors. Discuss your differences with an open mind. Do not hesitate to re-examine your views and change your opinion, if you come to believe it is wrong, but you should not surrender your honest beliefs about the weight or effect of evidence solely because of the opinions of your fellow jurors or for the purpose of returning a unanimous verdict.
 The eleven of you should give fair and equal consideration to all the evidence and deliberate with the goal of reaching an agreement which is consistent with the individual judgment of each juror. You are impartial judges of the facts. Your sole interest is to determine whether the Government has [proven] its case beyond a reasonable doubt.
 Tr. at 6348-49.
 
 
 [5]
 The reason for the district court's deciding upon this course of action are discussed fully at pp. 671-72 infra
 
 
 [6]
 The threat had apparently received considerable coverage in the Chicago press. Supp.App. at A-8
 
 
 [7]
 Rule 606(b) states:
 (b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.
 
 
 [8]
 The Supreme Court has suggested that "compelling institutional considerations" require giving a trial court primary responsibility to evaluate possible influences on the jury:
 [The trial judge] has seen and heard the jurors during their voir dire examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.
 Arizona v. Washington, 434 U.S. 497, 513-14, 98 S.Ct. 824, 834-35, 54 L.Ed.2d 717 (1978) (quoting Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 1837, 93 L.Ed. 974 (1949)). Accord Bruscino, 687 F.2d at 941.
 
 
 [9]
 In an alternative argument, the defendants contend that the visit from the FBI was a "governmentally directed visit" to a sitting juror that required an immediate mistrial under the Supreme Court's per curiam decision in Gold v. United States, 352 U.S. 985 (1957). Appellants' Br. at 36. However, Gold reverses in a two-sentence opinion a decision of the District of Columbia Circuit sitting en banc, which affirms without opinion and by equally divided vote an unreported decision of the District Court for the District of Columbia. Gold v. United States, 237 F.2d 764 (D.C.Cir.1956). The precedential value of this case is uncertain. In addition, Gold cites the previous year's Remmer decision as authority for the reversal, Gold, 352 U.S. at 985, and thus suggests that we should treat the FBI visit under the analytical scheme that has developed from Remmer and progeny
 
 
 [10]
 In the somewhat analogous context of pretrial voir dire the Supreme Court has held that the test for determining impartiality in a prospective juror is whether he or she can " 'lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (quoting Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961)); see also United States v. Bates, 852 F.2d 212, 219 (7th Cir.1988)
 
 
 [11]
 However, the special verdict forms filled out by the jurors indicate that the jury reached verdicts on five defendants that afternoon. United States v. Allen, 736 F.Supp. 914, 921 (N.D.Ill.1990)
 
 
 [12]
 Accord United States v. Balistrieri, 779 F.2d 1191, 1214 (7th Cir.1985), cert. denied, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986); United States v. Malsom, 779 F.2d 1228, 1240-41 (7th Cir.1985); United States v. Taylor, 569 F.2d 448, 454 (7th Cir.), cert. denied, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978)
 
 
 [13]
 Accord United States v. Bates, 852 F.2d 212, 219 (7th Cir.1988); United States v. Peters, 791 F.2d 1270, 1299 (7th Cir.), cert. denied, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986)
 
 
 [14]
 We also note that Haugh explicitly overruled United States ex rel. Buckhana v. Lane, 787 F.2d 230 (7th Cir.1986), to the extent that that case suggests that a trial court has the power under Rule 606(b) to inquire into the effect an impermissible contact had on jury deliberations. Haugh, 949 F.2d at 918. Defendants rely on this aspect of Buckhana, in part, to support their argument that the district court erred in not holding a hearing into the influence on the jury of the threat to Juror Layton
 
 
 [15]
 See Tanner v. United States, 483 U.S. 107, 121, 107 S.Ct. 2739, 2748, 97 L.Ed.2d 90 (1987) ("Federal Rule of Evidence 606(b) is grounded in the common law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences."); Wiedemann v. Galiano, 722 F.2d 335, 337 (7th Cir.1983) (Rule 606(b) "does allow jurors to testify as to whether extraneous information or an outside influence reached them.")
 
 
 [16]
 The court read the following coercion instruction:
 A defendant who has been coerced must be found not guilty. If the defendant committed the offense charged only because he reasonably feared that immediate, serious bodily harm or death would be inflicted upon him if he did not commit the offense, and he had no reasonable opportunity to avoid the injury, then he was coerced.
 Tr. at 6241-42.
 
 
 [17]
 For the text of the Silvern instruction that the court read and a description of the circumstances that led to the court's decisions to reinstruct the jury see, supra note 4 and accompanying text
 
 
 [18]
 The district court read the following entrapment instruction to the jury:
 One of the issues in this case is whether the Defendants Allen, Blackman, Carpenter, Clayton, Gully, Jarrell, Stephenson, Stewart, Stokes, Tilford, and Wilson were entrapped. A defendant who has been entrapped must be found not guilty.
 If a defendant had no prior intent or predisposition to commit the offense charged, and was induced or persuaded to do so by law enforcement officers or their agents, then he was entrapped. If, however, a defendant had a prior intent or predisposition to commit the offense charged, then he was not entrapped, even though law enforcement officers or their agents provided a favorable opportunity to commit the offense, made committing the offense easier, or even participated in acts essential to the offense.
 In determining whether a defendant had a prior intent or predisposition to commit the offense charged, you may consider the personal background of a defendant as well as the nature and degree of any inducement or persuasion of a defendant by law enforcement officers or their agents.
 Mere solicitation, by itself, by a government agent is not sufficient to establish the entrapment defense.
 Among the factors relevant in determining predisposition are the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the government; whether the defendant was engaged in criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated government inducement or persuasion; and the nature of the inducement or persuasion supplied by the government.
 While none of the factors alone indicates either the presence or absence of predisposition, an important factor is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated government inducement.
 Tr. at 6240-41.
 
 
 [19]
 The supplemental instruction that the court sent to the jury read as follows:
 Supplemental Instruction
 The defendant has asserted that he was a victim of entrapment. The government must therefore prove beyond a reasonable doubt, in addition to the elements of the offense itself, that the defendant was not entrapped.
 Where a person, having no previous intention to violate the law, is talked into committing a crime by government agents, he is entrapped, and the law, as a matter of policy, forbids his conviction.
 On the other hand, where a person is already willing to commit a crime, it is not entrapment if government agents merely provide an opportunity to commit the crime.
 So then, if you find beyond a reasonable doubt that, before anything was done by government agents, the defendant was willing to commit a crime like the one charged in the indictment if the opportunity was offered and that the government agents did no more than offer the opportunity, then you should find that the defendant was not entrapped.
 On the other hand, if the evidence in the case leaves you with a reasonable doubt whether the defendant was willing to commit the crime apart from the persuasion of government agents, then you must find him not guilty.
 Consider all of the evidence. Reread all instructions.
 R. 623 (emphasis supplied).
 
 
 [20]
 Rule 611(a) provides that:
 The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
 Fed.R.Evid. 611(a).