UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph B. CARSON, John K. Lanter, Wilbert Hall, Aaron Hall, and Ronald L. Flaugher, Defendants–Appellants.

Nos. 91–3589, 91–3626, 91–3633, 91–3939 and 92–2559.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1993.

Decided Oct. 21, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 15, 1993.

Michael Jude Quinley (argued), Office of the U.S. Atty., Crim. Div., Fairview Heights, IL, for U.S.

Peter Stragand (argued), Stragand & Tanner, St. Louis, MO, for Joseph B. Carson.

Marqua McGull–Billingsley (argued), East St. Louis, IL, for John K. Lanter.

James W. Ackerman (argued), Springfield, IL, for Wilbert Hall.

James Hackett (argued), Edwardsville, IL, for Aaron Hall.

Stephen R. Rice (argued), Belleville, IL, for Ronald L. Flaugher.

Before EASTERBROOK and KANNE, Circuit Judges, and ENGEL, Senior Circuit Judge.*

KANNE, Circuit Judge.

A superseding indictment charged each defendant with conspiring to distribute five kilograms or more of cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 846, and with using or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 2 and 924(c). Defendants Lanter, Wilbert ("Will") and Aaron Hall, and Flaugher were also charged with possession of firearms as convicted felons, in violation of 18 U.S.C. §§ 2, 922(g), and 924(a)(2). Two trials followed. The Hall brothers were tried with Flaugher; Lanter was tried with Carson. In the first trial, the jury convicted the Halls and Flaugher of all counts. The jury in the second trial convicted Lanter of all counts, and convicted Carson of the two counts with which he was charged.

Sentencing followed. Lanter and Will Hall were each sentenced to 420 months in prison. Aaron Hall was sentenced to 322 months; Flaugher to 235 months; Carson to 181 months. The defendants appeal, summoning an assortment of claims against their convictions and sentences. Not all of the challenges merit discussion. We address those that do, focusing primarily on the issues raised at oral argument. The convictions and sentences of Lanter, Carson, Aaron Hall and Flaugher withstand all claims of error and are therefore affirmed. Will Hall's conviction is affirmed, but his sentence must be vacated and his case remanded for resentencing.

**I.**

In essence, this is a story of friends, relatives, and the drug trade. The following is supported by the evidence presented at the trials, yet is by no means an exhaustive account of the defendants' activities. In 1987, John Lanter and long-time friend James Dant began selling cocaine. Dant picked up cocaine in Florida and distributed it to Lanter's dealers in southern Illinois. One of these dealers was Will Hall. Dant met Ronald Flaugher through Lanter. When Lanter went to prison in 1987, Flaugher supplied cocaine to Lanter's brother, who carried on the distribution business in John's absence.

* The Honorable Albert J. Engel, Senior Circuit Judge for the Sixth Circuit, is sitting by designation.

James Harris, a distributor, bought cocaine from Will and Aaron Hall on several occasions. The three men made three or four trips to Chicago to purchase kilogram quantities of the drug. Through the Halls, Harris met Lanter, whom Will described as his supplier. Harris also met Joseph Carson, whom Will supplied with ounce quantities of cocaine on at least two occasions in 1989 or 1990. Tracy Vinson, another distributor, travelled to Chicago with Will Hall to purchase cocaine. On one occasion she received an ounce of crack cocaine from Aaron Hall, for which she later repaid Will.

In the spring of 1990, an agent of the Illinois State Police introduced Joseph Sterkis to the DEA. Sterkis had information concerning drug trafficking in southern Illinois. The DEA made Sterkis a paid confidential informant, and thus began a six month investigation into the doings of John Lanter. Sterkis had known Lanter for several years in Breese, Illinois, and had worked with him in the construction business. In addition, around 1980, Sterkis began selling cocaine and marijuana to Lanter when Sterkis was in need of money. After 1987, the sales stopped, though Sterkis remained in contact with Lanter. In 1989, Sterkis was investigated in connection with a homicide. He traveled to Miami, Florida and worked for a time in a shop owned by Lanter. Later, when Sterkis returned to Illinois in 1990, Lanter arranged for him to stay with the Hall brothers in East St. Louis.

The goal of the DEA's investigation was to have Sterkis buy cocaine from Lanter. To this end, in June 1990, the DEA had Sterkis meet with Lanter. Over the next several weeks more meetings were held and phone calls made to discuss deals. Sterkis was fitted with a recording device for some of the meetings, which were taped. The DEA also made recordings of telephone calls between the two men. On July 6, 1990, Lanter told Sterkis that he had obtained cocaine from Will and Aaron Hall, but was not able to contact Flaugher. Later that day, Sterkis purchased four ounces of cocaine from Lanter. On August 13, Sterkis purchased another four ounces, which Lanter said came from the Halls. Lanter added that he could get money for drugs from the Hall brothers, as well as from Ronald Flaugher.

On September 13, Sterkis met with Lanter in Carlyle, Illinois, and proposed the sale of five kilograms of cocaine for $100,000. Sterkis (who is represented in the transcript of recordings as "CS") then asked about Flaugher and Will Hall:

> CS: You, you, you can get, you can get five of [']em for a hundred, that's twenty a piece.
>
> LANTER: Five of 'em for hundred thousand.
>
> CS: Just see what you can get together, talk to FLAUGHER? What do you think he can get together?
>
> LANTER: He didn't know, he's gotta go check he's supposed to if he wants to do it, he's gonna call me and talk about something stupid.
>
> CS: Throw it off. So you ain't got, what about WILL?
>
> LANTER: He ain't got a lot of money right now. He's got a bunch and he's got to move that first. And then ...
>
> CS: I see.
>
> LANTER: ... go with it.
>
> CS: Well ...
>
> LANTER: Well, just get a price, five for a hundred.
>
> CS: Well, five, five for a hundred, yeah.
>
> LANTER: O.K.

On November 18, Sterkis received a note from Lanter that read, "Joe call me at home or in truck 973 6402 / got stuff together on 5 100." Two days later, Sterkis called Lanter, who indicated that he had raised the money but did not have it in his possession. The next day, the two met and arranged for the deal to take place on November 30 in a parking lot of a Venture Store located on Highway 111 across from a Clark gas station. Lanter told Sterkis that they stood to make $5,000 from the sale because he had told his buyers that the price was $22,000 a kilogram.

On November 30, Lanter and Sterkis travelled first to Lanter's home near Keyesport,

Illinois, where Lanter changed cars.[1] He informed Sterkis that he had to pick up $50,000 from Flaugher at a Hardee's restaurant on Interstate 270, adding that he would distribute Flaugher's cocaine. Lanter also indicated that Will Hall would provide another $50,000. When Lanter asked if they should carry guns, Sterkis said that he would not, adding "it's up to you, you know, if you got one, don't be flashin it, you know."

Lanter dropped Sterkis off at an Amoco gas station near the Hardee's restaurant. He then drove to the restaurant's parking lot and met for a few minutes with Flaugher in Flaugher's pickup truck. When he returned to the Amoco station to pick up Sterkis, Lanter had a bag containing ten bundles of $5,000 each. Lanter reported that Flaugher wanted to obtain an additional two kilograms of cocaine, and that he would meet Flaugher later in the afternoon.

Lanter and Sterkis then drove to a Hen House restaurant near Interstates 64 and 157, where they met with two undercover agents who showed Lanter the five kilograms of cocaine. From there, Lanter and Sterkis travelled to the Mid City Pallet Company, where Will and Aaron Hall worked, and then to Aaron Hall's house. At the house, Lanter gave Aaron a listening device and explained how it operated. The three men then returned to the Pallet Company, where Will and Aaron each gave Lanter $5,000. Aaron disappeared behind a building and returned with a jar he had unearthed. The jar was filled with money, supposedly an additional $40,000.[2] Will then asked Lanter to show them the $50,000 he had. Lanter did so.

Another man whom Sterkis did not know was present as money was being discussed. Lanter told him the man was Joseph Carson. Carson told Will Hall that there were "strangers in the neighborhood" and described where they were located and their vehicles. Carson then drove Will around the block past one of the agents on stake out at the Pallet Company. The Hall brothers

mentioned to Lanter that they had an uneasy feeling and that the deal should be called off.

Instead, Lanter and Sterkis left the pallet yard with the money, followed by the Hall brothers in a blue pickup truck. Carson followed the Halls in his rose colored sedan. The three vehicles travelled together until, on the road leading to the Venture Store, they separated. Lanter and Sterkis continued to the Clark gas station across from the Venture parking lot. They were met there shortly by Will and Aaron. Carson then arrived and spoke to Will. The three vehicles left for the Venture parking lot, where Carson and Aaron Hall parked within a few rows of each other facing the same direction. All the men were promptly arrested by DEA agents.

The following items were seized from Lanter and his vehicle: a wireless transmitter; a .38 caliber Colt semi-automatic pistol with five rounds in the clip; a spare clip carrying an additional five rounds; the glass jar filled with money; a bag containing $10,000 in loose currency and $50,000 in ten bundles of $5,000 each; and a small amount of marijuana. From Aaron Hall and his pickup truck: a wireless receiver and earplug; a 9mm Luger semi-automatic pistol, fully loaded with fourteen rounds in the clip; and a small amount of crack cocaine base. Brother Will was arrested in a store next to the Venture Store; later, he confessed to an Illinois State Police Officer his involvement in the five kilogram deal.

When Carson was seized, agents found a fully loaded .357 Magnum Smith and Wesson revolver under the driver's seat, partially covered by the floor mat. Flaugher was arrested a few hours later. In addition to $1,483 in loose currency in his wallet, police seized a bundle of $5,000 from his truck. This bundle was arranged in the same fashion as the $5,000 bundles seized from Lanter's car.[3]

---

1. Lanter and Sterkis were under surveillance at each stop during the day.

2. In fact, the jar contained $39,400 in cash.

3. Each bundle consisted of five stacks of $1,000. Each stack was wrapped with a rubber band and faced a different direction.

## II.

*John Lanter*

Lanter raises a number of arguments, most of which do not require discussion. At oral argument, his appellate counsel withdrew a claim that Lanter was denied a fair trial because his trial attorney had a conflict of interest. We do not address that argument except to say Lanter may pursue it in a proper motion filed in the district court under 28 U.S.C. § 2255.

■ Lanter argues that insufficient evidence exists to convict him of carrying a firearm in relation to a drug trafficking crime. Under this 18 U.S.C. § 924(c)(1), the government must prove two elements: (1) that Lanter used or carried a firearm and (2) that this use or carrying was during and in relation to a drug trafficking offense. *United States v. Woods*, 995 F.2d 713, 717 (7th Cir.1993); *United States v. Montgomery*, 990 F.2d 266, 270 (7th Cir.1993). We review the evidence in a light most favorable to the government to determine whether any rational jury could have found these elements beyond a reasonable doubt. *United States v. Wilson*, 938 F.2d 785, 791 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 946, 117 L.Ed.2d 115 (1992); *United States v. Ocampo*, 890 F.2d 1363, 1370 (7th Cir.1989).

■ Lanter claims that the only evidence presented by the government on this issue was the testimony of Sterkis, and that there was no evidence tying the .38 caliber pistol to the drug deal. We disagree. On the day the five kilogram deal was to be consummated, Lanter asked Sterkis if they should carry guns. Sterkis replied that he would not. Lanter did, however, and the full loaded weapon was retrieved from his car. "Dealers who keep guns 'in strategic proximity' to their drugs or transactions 'use them in relation to' their drug trafficking for purposes of" section 924(c). *Woods*, 995 F.2d at 718 (quoting *United States v. Malin*, 908 F.2d 163, 168 (7th Cir.), *cert. denied*, 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990)). The statute does not require that the weapon be found on or near the defendant. *Malin*, 908 F.2d at 168. *See also United States v. Edun*, 890 F.2d 983, 987–88 (7th Cir.1989) (gun located in locked trunk of defendant's car); *United States v. Rosado*, 866 F.2d 967, 969–70 (7th Cir.), *cert. denied*, 493 U.S. 837, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989) (gun located in defendant's jacket left in his car while he conducted drug transaction 30 feet away). "[T]he Government is only obliged to show that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking; a showing that the weapon was used, handled or brandished in an affirmative manner is not required." *United States v. Molinar–Apodaca*, 889 F.2d 1417, 1424 (5th Cir.1989). *See also United States v. Cooper*, 942 F.2d 1200, 1207–08 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1303, 117 L.Ed.2d 524 (1992). Carrying a gun to protect drugs or money unquestionably constitutes "use" under § 924(c). *Woods*, 995 F.2d at 718. The jury could have reasonably concluded that Lanter carried a gun to the Venture Store parking lot in order to protect himself as well as the large amount of cash in his possession.

■ Lanter also claims that the government failed to disclose exculpatory evidence in violation of the rule established in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A *Brady* violation occurs where the prosecution suppresses evidence that is favorable to the defendant and material to an issue at trial. *United States v. Polland*, 994 F.2d 1262, 1266 (7th Cir.1993). "Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Dweck*, 913 F.2d 365 (7th Cir.1990). Either type of evidence is material " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Id.* at 371 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). Thus, the prosecutor is only required to disclose to the defendant favorable evidence that, if suppressed, would deprive the accused of a fair trial. *Dweck*, 913 F.2d at 371.

Lanter's defense at trial was that Sterkis coerced him into joining a conspiracy to distribute cocaine. In his brief, Lanter gives only a bare bones description of the evidence he believes falls within *Brady*'s ambit. Specifically, he claims the government had in its possession a statement by a witness "which would have injured Sterkis' credibility, and would have provided cross-examination material." In addition, "the Government had papers from another investigation in which it was alleged that Sterkis was involved in a murder." Finally, according to Lanter, "the Government had papers on Sterkis' domestic violence," in which an individual "filed for protection from Sterkis before her murder. This could have shown [Sterkis's] hostility, and shown that [Lanter] was indeed afraid and coerced by Sterkis into committing the crime."

■■■ Lanter makes no claim that he requested this material from the government. Regardless, his claim of a *Brady* violation must fail. First, Lanter has not sufficiently described the evidence in question and its connection to his theory of defense. Second, what he has described is not "material" in the sense that term is understood under *Brady*. That Sterkis may have threatened or harmed others does not, of course, inexorably support the claim that he coerced Lanter to buy and sell drugs. Lanter does not argue that Sterkis threatened him in any way. In any case, the content of the extensive recordings made by the DEA in this case belie such a claim. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). No reasonable probability exists that the material described by Lanter would have been sufficient to rebut the direct evidence of his participation in a scheme to deal cocaine.

Lanter next complains that the district court erred by enhancing his base offense level during sentencing for obstruction of justice. Federal Sentencing Guideline § 3C1.1 provides for a two point increase in a defendant's offense level if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The district court's finding of obstruction is a finding of fact reviewed only for clear error. *United States v. Price*, 988 F.2d 712, 721 (7th Cir. 1993).

■■■ At Lanter's sentencing hearing, the district court stated:

We're not penalizing him because he took the stand and testified, in part, and this is only part of it, we are penalizing him because he took the stand and testified and as far as I am concerned, perjured himself. I base my statement that he perjured himself on the jury's verdict, because the jury, in order to find him guilty, had to find that he had not told the truth on the stand. Apart from the jury's verdict, giving us a presumption of perjury on his part, the Court finds from its own consideration of the evidence of the entire trial that in many instances, his testimony was false now, I think that's probably enough to justify the increase of two points, but apart from that, the pretrial proceedings in this case, where the defendant made a proffer and then later on withdrew it, he was going to plead and then he wasn't going to plead, his entire conduct, I think, also lends support to the increase of two points. That certainly I think can be considered, although I think his testimony here at the trial in and of itself is enough to support the increase.

Lanter objects to the enhancement for perjury, citing *United States v. Dunnigan*, 944 F.2d 178 (4th Cir.1991), in which the court held that "[t]he rigidity of the guidelines makes the § 3C1.1 enhancement for a disbelieved denial of guilt under oath an intolerable burden upon the defendant's right to testify in his own behalf." *Id.* at 185. The Supreme Court recently reversed the Fourth Circuit on this point. *United States v. Dunnigan*, ——— U.S. ———, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). In *Dunnigan*, the Court held that an enhancement for obstruction is warranted if "[t]he district court's determination ... encompasses all of the factual predi-

cates for a finding of perjury." *Id.* at ——, 113 S.Ct. at 1117. A witness testifying under oath commits perjury if he gives "false testimony concerning a material matter with a willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *Id.* at ——, 113 S.Ct. at 1116. Moreover, it is well settled that a defendant's right to testify in his own behalf is not a license to commit perjury, thus an enhancement under § 3C1.1 for committing perjury does not chill the exercise of a constitutional right. *Id.* at ——, 113 S.Ct. at 1117; *United States v. Easley,* 977 F.2d 283, 287 (7th Cir.1992).[4]

■ The district court stated that the jury's verdict created a presumption that Lanter perjured himself on the witness stand, but specifically determined from its own independent review of the evidence that Lanter had done so on several occasions during trial. Although the court also mentioned Lanter's withdrawal of a plea, it concluded that the defendant's "testimony ... at the trial in and of itself is enough to support the increase." We think the district court's finding sufficiently encompassed the factual predicates required by *Dunnigan.* *See Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1117; *United States v. Emenogha,* 1 F.3d 473, 482 (7th Cir.1993). And our review of the record convinces us that the court did not commit clear error by awarding a two point enhancement based on Lanter's perjury.

Finally, Lanter challenges the district court's finding that he played an aggravating role in the conspiracy under U.S.S.G. § 3B1.1(a). That section provides for a four point increase in a defendant's base offense if he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Among the factors to be considered, according to the comment to the guideline, are

the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, ... the degree of participation in planning or organizing the offense, the

nature and scope of the illegal activity, ... and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 comment. (n.3).

A participant "is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 comment. (n. 1). The defendant is included among the participants in the offense. *United States v. Schweihs,* 971 F.2d 1302, 1318 (7th Cir.1992); *United States v. Reid,* 911 F.2d 1456, 1464 (10th Cir.1990), *cert. denied,* 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991).

At sentencing, the district court stated:

My recollection of the evidence ... was that there didn't seem to be too much question about who was the leader or organizer in this case. We certainly have more than five people involved.

. . . .

And I am not saying, and I don't think the law requires that he be the only leader or organizer, but he wasn't exactly the gopher either, was he?

. . . .

I think the evidence established pretty clearly that the calculation is correct and that the increase should be four points and that he was a leader or organizer based on the evidence that I heard.

Lanter argues that the court never made a finding that he had actual control over four other individuals in the conspiracy. "Organizers and leaders of criminal activity play an important role in the planning, developing, directing, and success of the criminal activity." *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989). A defendant receiving a "leader or organizer" enhancement under § 3B1.1(a) must have some control, direct or indirect, over at least four other participants in the offense. *See Schweihs,* 971 F.2d at 1318; *United States v. McGuire,* 957 F.2d 310, 317 n. 4 (7th Cir.1992); *Reid,* 911 F.2d at 1465 n. 8.

---

**4.** We point out that committing or suborning perjury is (and always has been) identified as "obstruction of justice" in the Guidelines Commentary. U.S.S.G. § 3C1.1, comment. (n. 3(b)) (Nov. 1992). *See also id.* (Nov. 1990); *id.,* comment. (n. 1(c)) (Nov. 1989).

■ A finding that the defendant functioned as an organizer or leader does not necessarily mean that he directly controlled other individuals. *United States v. Paulino,* 935 F.2d 739, 758 (6th Cir.1991), *cert. denied,* — U.S. —, —, —, —, 112 S.Ct. 315, 323, 660, 883, 116 L.Ed.2d 257, 264, 751, 787 (1991–92). Rather, "the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purposes of carrying out the crime." *United States v. Fuller,* 897 F.2d 1217, 1220 (1st Cir.1990). Efforts to marshall other individuals for the purpose of executing the crime thus satisfy § 3B1.1(a). *See United States v. Litchfield,* 959 F.2d 1514, 1522 (10th Cir.1992); *Reid,* 911 F.2d at 1464.

■ Although the district court did not make a specific finding that Lanter exercised sufficient control over four other members of the conspiracy, the record adequately supports such a determination. *See United States v. Beal,* 960 F.2d 629, 635 (7th Cir.) (sentence affirmed even though district court did not specifically state reasons for finding defendant had not accepted responsibility for his crime under U.S.S.G. § 3E1.1 because court's denial was sufficiently specific to allow for meaningful review and because there was an adequate basis in the record for such a finding), *cert. denied,* — U.S. —, 113 S.Ct. 230, 121 L.Ed.2d 166 (1992); *United States v. Blas,* 947 F.2d 1320, 1330 (7th Cir. 1991) (same), *cert. denied,* — U.S. —, 112 S.Ct. 1234, 117 L.Ed.2d 468 (1992). Lanter convinced Will Hall and Ronald Flaugher to put up $50,000 each in a deal to buy five kilograms of cocaine. The evidence also shows that he had some control over Aaron Hall. On the day the buy was to occur, Lanter travelled to Aaron's house and fitted him with an electronic listening device so that Aaron could monitor Lanter's conversations at the Venture Store parking lot. The upshot is that Lanter intended for Aaron to provide protection during the deal.

Lanter's control over Carson is more indirect. By enlisting the help of Will Hall, Lanter incidentally recruited Carson. The two were not strangers, however; at the pallet yard, Lanter identified Carson for Sterkis. The evidence is strong that Carson conducted counter-surveillance at the yard, presumably at the behest of Will Hall. Yet it is clear that Carson would not have been at the yard that day had it not been for Lanter. Lanter and Sterkis led the way from the pallet yard to the Clark gas station and the Venture Store. The Halls and Carson followed. The evidence supports a finding that Carson's actions were sufficiently directed by Lanter's planning and organization. It matters not that Carson was initially brought into the scheme by the Hall brothers. In short, Flaugher, the Halls, and Carson would not have been at the Mid City Pallet Company, the Clark station, and, ultimately, the Venture Store parking lot had it not been for Lanter's orchestrations. The district court's determination that Lanter was an organizer or leader under § 3B1.1(a) is not clearly erroneous.

*Joseph Carson*

Count One of the superseding indictment charged:

> From in or about 1986, the exact date being unknown to the Grand Jury, and continuing thereafter until on or about November 30, 1990, in Madison, St. Clair, Calhoun, Bond, and Clinton Counties, in the Southern District of Illinois, and elsewhere,
>
> JOHN K. LANTER,
>
> RONALD D. FLAUGHER,
>
> WILBERT HALL, and
>
> AARON HALL,
>
> aided and abetted by
>
> JOSEPH R. CARSON,
>
> defendants herein, did knowingly combine, conspire, and agree together, with each other and with other persons both known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute various quantities of cocaine, a Schedule II Narcotic Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1),

these various quantities involving a total of 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); all in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

At the close of the evidence, the government submitted instruction twelve, which stated that Carson and Lanter were charged with conspiracy to possess with the intent to distribute cocaine. Carson's defense counsel objected to the giving of this instruction but was overruled. Counsel did not object to the government's instructions twenty-three and twenty-four, which defined the crime of conspiracy.[5] All three instructions were given to the jury, which found Carson guilty of conspiracy.

Carson maintains that he was charged with aiding and abetting the conspiracy only, and that the district court lacked jurisdiction to instruct the jury that he was charged with conspiracy. Moreover, according to Carson, instruction twelve constructively amended the indictment, thereby broadening the possible basis of his liability in violation of his Fifth and Sixth Amendment rights.

At the time Carson's counsel objected to instruction twelve, the government took the position that Carson could be found guilty of conspiracy by aiding and abetting the conspiracy. The government makes essentially the same argument on appeal. According to this argument, aiding and abetting "does not constitute a separate offense" from conspiracy, but is "rather a theory of criminal liability" that makes the aider and abettor guilty of whatever substantive or inchoate crime is committed. To support its argument, the government points to 18 U.S.C. § 2, which states, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." The government contends that because un-

der section 2 an aider and abetter is punished as a principal, instruction twelve is neither incorrect nor misleading and Carson was properly found guilty of conspiracy.

▮ Inasmuch as the government may be understood to claim that aiding and abetting a conspiracy necessarily makes the aider and abettor a member of the conspiracy, we disagree.

> Suppose someone who admired criminals and hated the police learned that the police were planning a raid on a drug ring, and, hoping to foil the raid and assure the success of the ring, warned its members—with whom he had no previous, or for that matter subsequent, dealings—of the impending raid. He would be an aider and abettor of the drug conspiracy, but not a member of it. For the essence of conspiracy is agreement, and there is none in our hypothetical case.

*United States v. Zafiro*, 945 F.2d 881, 884 (7th Cir.1991) (citation omitted), *aff'd*, —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). *See also United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir.1990); *United States v. Galiffa*, 734 F.2d 306, 310 (7th Cir.1984); *United States v. Beck*, 615 F.2d 441, 449 n. 9 (7th Cir.1980). Thus the crime of aiding and abetting does not require proof of an agreement to break the law. Rather it requires knowledge of the crime being aided and abetted, a desire to help the activity succeed, and some act of helping. *Zafiro*, 945 F.2d at 887.

▮ In this case, however, the point is largely academic for we think that the indictment can fairly be read to charge Carson with the crime of conspiracy. While the indictment states that Carson "aided and abetted" the other defendants, the portion of the charge that follows makes clear that *all* of the defendants were charged with violating 21 U.S.C. § 846, which makes it a crime to conspire to violate § 841, which, in turn, outlaws the possession of drugs with the

---

5. Counsel also did not object to instruction number 29, which stated:

> Any person who knowingly aids, abets, counsels, commands, induces or procures the commission of a crime is guilty of that crime.

> However, that person must knowingly associate himself with the criminal venture, participate in it, and try to make it succeed.

> This instruction was accepted by the district court and given to the jury.

intent to distribute.[6] Specifically, after listing the defendants, Count One goes on to state that "defendants herein, did knowingly combine, conspire, and agree together, ... to knowingly and intentionally distribute and possess with intent to distribute various quantities of cocaine...." Any doubt as to what Carson was charged with in Count One is dispelled by Count Two, which charges each defendant with possession of a firearm "during and in relation to a drug-trafficking crime, to wit: *conspiracy* to distribute and possess with intent to distribute various quantities of cocaine...." (emphasis added).

Because we think an objective reading of the indictment indicates that Carson was charged with conspiracy, we reject the argument that the reference to aiding and abetting in Count One was anything other than surplusage. The language of the indictment itself provided the district court with a sufficient basis for giving instruction twelve. For this reason, there is no jurisdictional defect and the court did not impermissibly amend the indictment.

 Carson also claims that insufficient evidence supports his conviction for conspiracy. Conspiracy law punishes agreements to commit crimes. *United States v. Lechuga,* 994 F.2d 346, 348 (7th Cir.1993) (en banc); *United States v. Blankenship,* 970 F.2d 283, 285 (7th Cir.1992). To sustain a conspiracy conviction, the government must provide substantial evidence that a conspiracy existed and that Carson knowingly agreed to join it. *United States v. Pazos,* 993 F.2d 136, 139 (7th Cir.1993). For his part, Carson does not contest that the government proved the existence of an agreement to distribute cocaine, only that the government did not prove beyond a reasonable doubt that he in fact joined it. He relies on this court's pronouncements that knowledge of an illegal activity or mere presence at the scene of a crime does not establish membership in a conspiracy. *See Pazos,* 993 F.2d at 140; *Za-*

*firo,* 945 F.2d at 887; *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir.1990).

 "[A] defendant has a heavy burden in challenging the sufficiency of the evidence with regard to his participation in a conspiracy." *United States v. Gutierrez,* 978 F.2d 1463, 1468 (7th Cir.1992). We review the evidence and all reasonable inferences therefrom in a light most favorable to the government. *Id.* "If any rational jury could have found the defendant guilty beyond a reasonable doubt, the conviction will be affirmed." *United States v. Curry,* 977 F.2d 1042, 1053 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993). Our review is not limited to direct evidence. Circumstantial evidence may be used to demonstrate participation in a conspiracy; indeed, it can be the sole support of a conspiracy conviction. *Pazos,* 993 F.2d at 139; *Durrive,* 902 F.2d at 1225. Finally, in conducting our review, we will not reweigh the evidence or evaluate the credibility of witnesses. *United States v. Goines,* 988 F.2d 750, 758 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195, (1993); *United States v. Maholias,* 985 F.2d 869, 874 (7th Cir.1993).

We recently held that the government can sustain a drug conspiracy conviction solely on evidence that the defendant engaged in counter-surveillance during a drug transaction. *Pazos,* 993 F.2d at 139–41. Such a holding does not obliterate the "mere presence" rule, for we have long recognized that "while presence alone is not enough to convict, '[p]resence or a single act will suffice ... if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.'" *Id.* at 140 (quoting *United States v. Binkley,* 903 F.2d 1130, 1134 (7th Cir.1990)). *See also Gutierrez,* 978 F.2d at 1469; *United States v. Caliendo,* 910 F.2d 429, 438 (7th Cir.1990); *United States v. Herrero,* 893 F.2d 1512, 1532 (7th Cir.), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990); *United States v. Montoya,* 891 F.2d 1273, 1287 (7th Cir.1989); *Unit-*

---

**6.** Of course, inserting 18 U.S.C. § 2 into Count One does not mean that Carson, or any other defendant for that matter, was charged with aiding and abetting. That statute does not create a separate crime, but "merely codified the accepted principles governing who [can] be held liable for the commission of a substantive offense." *United States v. Gonzalez,* 582 F.2d 1162, 1165 (7th Cir.1978). *See also Galiffa,* 734 F.2d at 310; *Londono–Gomez v. INS,* 699 F.2d 475, 476–77 (9th Cir.1983); *United States v. Cowart,* 595 F.2d 1023, 1031 n. 10 (5th Cir.1979).

ed States v. Zambrana, 841 F.2d 1320, 1346 (7th Cir.1988); United States v. Xheka, 704 F.2d 974, 988–89 (7th Cir.), cert. denied, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); United States v. Mancillas, 580 F.2d 1301, 1308 (7th Cir.), cert. denied, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978).

Carson's actions on November 30, 1990 clearly meet this test, negating any claim that he was "merely present" at three locations with other members of the conspiracy on the day selected for the five kilogram deal. At the pallet yard, Carson informed Will Hall that there were "strangers" in the area and described where they were located and their vehicles. He then drove Will around the block so he could have a look. When Sterkis, Lanter, and the Halls left the yard, Carson followed them in his car, first to the Clark station, where he again spoke to Will, then to the Venture parking lot, where he parked near Aaron Hall's vehicle. With him all the while was a loaded .357 Magnum.

We think substantial evidence demonstrates that Carson engaged in counter-surveillance for the purpose of protecting both the Halls and their investment in the five kilogram transaction. His conduct on that day was obviously aimed at ensuring the buy occurred without a hitch, thus furthering the objective of the conspiracy. See Pazos, 993 F.2d at 139. "If the jury concludes that the defendant's behavior was counter-surveillance, it is permissible for it to conclude that the defendant was a willing member of the conspiracy." Id. at 140. His participation in the conspiracy established, Carson's sufficiency claim necessarily fails. His other arguments do not merit discussion.

### Wilbert Hall

Will Hall argues that the district court committed reversible error by denying his motion for a mistrial based on statements made by a prospective juror. During the voir dire, the court asked members of the jury panel if they recognized the names of any of the defendants. One of the panel, David James, responded:

I think you said John Lanter from Keysport [sic], Lanter, whatever the name is. I don't know whether it was Lanter, it

sounds familiar. We had a club house there, and a bunch of guys used to observe stuff and we were running with him down there and had a lot of trouble with that area. The name sounds familiar. I couldn't swear that's the same one. This guy is originally from Beckman.

A few minutes later, the court asked members if their personal feelings about drugs and guns would influence their decision making. The following exchange occurred between prospective juror James and the district judge:

Mr. James: That Lanter you talked about, that's the same bunch I got into it with in the club house. I know what they were doing there, the man with the .45 pistol in my face.

The Court: Maybe we better excuse you then, sir.

Mr. James: Yes, sir.

The Court: You have a seat back over there in the back.

During a conference, Hall's counsel moved for a mistrial based on James' statements. The court denied the motion. On appeal, Hall maintains that this was error and that he was denied an impartial jury because of James' prejudicial statements. He insists that James' dismissal did not cure the problem because the statements were made in front of the entire panel. In addition, according to Hall, the judge should have excused any juror who heard what James said or, at the least, admonished the panel to disregard what they heard.

Hall relies primarily on Dickson v. Sullivan, 849 F.2d 403 (9th Cir.1988). In that case, Dickson, the defendant, had been convicted of murdering a tavern owner. He admitted to being in the tavern before the killing, but testified that he had returned later in the evening to find the owner dead. Id. at 404. During the trial, a deputy sheriff responsible for escorting jurors to and from the courtroom had made a statement to two jurors to the effect that Dickson had " 'done something like this before.' " Id. at 405. The court of appeals noted that the trial judge found the jurors had not discussed the deputy's statement during their delibera-

tions, but determined nonetheless that the comment "was both directly related to a material issue in the case and highly inflammatory." *Id.* at 407. According to the court, there was "a direct and rational connection between the statement that Dickson had 'done something like this before' and the conclusion that Dickson had done 'this' again." *Id.*

The court went on to find that the statement could not be dismissed as cumulative of other evidence presented at trial because "there was no evidence introduced at trial that Dickson had previously engaged in any acts of violence, let alone an act as brutal and serious as the one with which he was charged." *Id.* at 408. Thus, the deputy's statement could only be understood as referring to "a previous act of brutality or murder." *Id.* The trial court's instructions to the jury concerning the use of prior convictions and the requirement that a decision be based only on the trial evidence did not ameliorate possible prejudice because "where the extrajudicial statement concerns a defendant's prior criminal acts, the efficacy of such instructions is subject to serious doubt." *Id.* As a result, the court found that a reasonable probability existed that the two jurors who were present when the remark was made were influenced in their determination of Dickson's guilt. Because it was impossible for the court to conclude that the error was harmless beyond a reasonable doubt a new trial was required. *Id.* at 408–09.

 Due process requires that a jury in a criminal case be capable and willing to decide the case solely on the evidence presented during trial. *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). A defendant is entitled to a new trial when the jury uses evidence that has not been introduced at trial if there is a reasonable possibility that the extrinsic material could have affected the jury's verdict. *See United States v. Sanders,* 962 F.2d 660, 668 (7th Cir.), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 262, 284, 121 L.Ed.2d 192, 210 (1992); *United States v. Andrews,* 895 F.2d 406, 408 (7th Cir.1990); *Dickson,* 849 F.2d at 405. "Determining whether the verdict was affected is a fact-driven exercise that will

depend on the circumstances of the case." *Sanders,* 962 F.2d at 668. Because "[t]he district court has had firsthand contact with the case and the jury," *id.,* we view its decision to deny Hall's motion for a mistrial with deference. As the Supreme Court has recognized,

> [t]here are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias. He has seen and heard the jurors during their *voir dire* examination. He is the judge most familiar with the evidence and the background of the case on trial. He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors. In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.

*Arizona v. Washington,* 434 U.S. 497, 513–14, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978) (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)) (footnote omitted). *See also Wainwright v. Witt,* 469 U.S. 412, 429–34, 105 S.Ct. 844, 855–57, 83 L.Ed.2d 841 (1985) (trial judge must observe the demeanor and response of the prospective jurors and evaluate any possible prejudice).

Accordingly, we will review the district court's decision for an abuse of discretion, and will reverse its decision "only if we have a very strong conviction of error." *Sanders,* 962 F.2d at 669 (citing cases). *See also United States v. Canino,* 949 F.2d 928, 937 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992) (district court's disposition of a mistrial motion is reviewed for abuse of discretion).

 Our review of the record indicates that the district court did an able job of minimizing the prejudicial effect of James' unfortunate remarks without drawing undue attention to them. After excusing James and questioning other members of the panel, the district court admonished the entire panel that it was to "decide this case not on what someone else says, not on what you read in the paper, not on what you see in the paper, not on what you see on television, but you

**590**

have to decide this case based on what you hear in this courtroom from the witness stand, the evidence and the law that I give you." The court went on to describe the various forms that trial evidence would take in the case. After further examination, the court asked members of the panel:

> Now, is there anything other than that, is there anything else that affects the case, is there anything that you have thought about maybe since I have been talking, you have had a chance to think things through, is there anything at all that you want to bring up that you feel might have a bearing on your ability to be a fair juror in this case, anything at all, that you want to bring up?

In denying Hall's motion for a mistrial, the district judge stated that though he (the judge) was "within six feet of" James, it was difficult to hear what he said. The court also pointed out that James referred only to Lanter. Hall objects that James referred to Lanter's "bunch," but such an open-ended description, without more, is an insufficient basis on which to conclude that James was suggesting he knew, or had even heard of, the other defendants. Consequently, we think this case is distinguishable from *Dickson*, in which the prejudicial remark was directed specifically at the defendant. Any connection between James' remarks and Wilbert Hall, on the other hand, is tenuous at best.

For this reason, we do not think the district court was required to dismiss every member of the panel who might have heard James' remarks. Indeed, the very process of identifying those jurors would only compound the problem by drawing attention to it, making sure every member of the venire heard (or at least was aware of) the substance of what James said. The district court properly avoided this route.

■ If a juror can put aside his or her impressions gained from extrinsic material and render a fair verdict based upon the evidence, the impartiality requirement of due process is satisfied. *See United States v. Bates*, 852 F.2d 212, 219 (7th Cir.1988). In this case, a number of prospective jurors apparently had had negative experiences associated with drugs or drug dealing and admitted they felt incapable of rendering an impartial decision as a result. These individuals were immediately excused. Others knew, or at least had heard of, some of the defendants or witnesses. However, each member of the panel was given more than one opportunity to state whether he or she could deliberate impartially, and the venire was instructed, also more than once, that it must base its decision only on the evidence heard in court and the instructions on the law given by the district judge.

"It is presumed that the jury will follow an instruction to disregard inadmissible evidence unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instruction and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *United States v. Van Wyhe*, 965 F.2d 528, 533 (7th Cir.1992) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987)). We do not discern from the record that the jury could not follow the district court's clear and unambiguous instructions. Likewise, given the amount of evidence presented against Hall, we cannot say it was even likely James' statements had a "devastating" effect on Hall's case.

Finally, we must consider the effects of a contrary ruling in this case. In so doing, we rely on the observations of the Fifth Circuit Court of Appeals in *United States v. Doggett*, 821 F.2d 1049, 1051 (5th Cir.1987). In that case, a prospective juror made statements in the presence of the entire venire concerning pretrial publicity unfavorable to the defendant. *Id.* at 1050. Holding that the trial court did not err in denying defense counsel's motion for a mistrial or, in the alternative, dismissal of the venire, the court of appeals stated:

> If the appellant were to prevail in this case, it would establish the principle that anytime any prospective juror indicated prejudice based upon newspaper stories, or actual knowledge of the events, or knowledge of people who knew something about the events, the entire jury venire would have to be dismissed. Yet such general statements are grist for the mill of any

voir dire inquiry in any criminal charge which involves someone at least minimally well known in the community.... When some ... questions indicate members of the venire feel unable to judge impartially based solely upon what goes on in the courtroom, we cannot hold that the court must start over again every time. Such a burden cannot be placed upon the criminal processes and the selection of a jury.

*Id.* at 1051.

We conclude that there was no reasonable probability that the extrinsic material affected the jury's verdict. Rather, we are convinced that Hall was convicted on the basis of properly admitted evidence. The district court did not abuse its discretion by refusing to grant Hall's motion for a mistrial.

■ Will Hall also challenges his conviction for carrying a firearm in relation to a drug trafficking offense. Hall was charged under 18 U.S.C. § 924(c) with carrying the 9mm Luger seized from the unlocked glove compartment of the pickup truck driven by Aaron Hall to the Venture Store. Hall claims that there was insufficient evidence presented at trial that he knew of or even suspected the gun's presence in the car. In support of his claim, Hall points out that he was not the owner of the gun and was not arrested near the truck, but had entered a store next to the Venture Store.

The district court instructed the jury on the *Pinkerton* doctrine of liability. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Under that doctrine,

[a] defendant may be found guilty of violating section 924(c) of Title 18 if a coconspirator used or carried a firearm during and in relation to the conspiracy, in furtherance of or as a natural, foreseeable consequence of the conspiracy, and if that defendant was a member of that conspiracy at the time. Therefore, as long as the government proved that one coconspirator used or carried one firearm in furtherance of the conspiracy, *any* defendant who was a member of the conspiracy at that time can be convicted of [the firearm offense].

*Goines,* 988 F.2d at 774 (citations omitted) (emphasis added). *See also Gutierrez,* 978 F.2d at 1467–68; *United States v. Allen,* 930 F.2d 1270, 1275 (7th Cir.1991); *Ocampo,* 890 F.2d at 1372.

In extending the *Pinkerton* doctrine to section 924, we have recognized that "[a] conspirator in a drug conspiracy can be held liable for a coconspirator's § 924(c) violation because it is reasonably foreseeable that a firearm may be carried during a drug transaction." *Pazos,* 993 F.2d at 141 (citing cases). Hall does not challenged the sufficiency of the evidence demonstrating his membership in the conspiracy charged by the government. Even so, we note that there is overwhelming evidence to support his conspiracy conviction. It follows that we need not address Hall's arguments concerning the 9mm Luger found in the pickup truck, for he is vicariously liable under *Pinkerton* for Lanter's section 924 conviction, addressed above.

■ Hall's last argument, however, is on surer footing. The district court found under U.S.S.G. § 3B1.1(a) that Hall was a leader or an organizer of a criminal activity that involved five or more participants or was otherwise extensive, and therefore increased his base offense level by four points. Hall challenges this finding. The record supports a finding that Hall recruited both his brother Aaron and Joseph Carson for the purpose of executing the five kilogram deal. However, it fails to support a finding that he exercised control, either directly or indirectly, over any other member of the conspiracy. The government contends that Hall "negotiated for supplies of cocaine," and "used others to distribute cocaine," but does not argue that these "others" were "person[s] who [were] criminally responsible for the commission of the offense" of conspiracy. U.S.S.G. § 3B1.1 comment (n. 1). Accordingly, we must vacate this portion of the district court's sentence and remand for resentencing.

### Aaron Hall

Like Lanter, Aaron Hall's appeal initially included a claim of ineffective assistance of counsel. Like Lanter's counsel, Hall's attorney withdrew this claim at oral argument.

Thus, we do not address that argument except to say, once again, that it may be raised in a motion under 28 U.S.C. § 2255. We turn to Hall's other arguments.

■ Hall insists that insufficient evidence exists to convict him of the conspiracy charged in the indictment. His claim that he was "merely present" at a drug transaction is meritless. So is the claim that the evidence showed a series of conspiracies in the manner of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). On the day of the five kilogram deal, Lanter met Hall at his house and fitted him with a listening device. Hall then traveled to the pallet yard, where he handed Lanter $5,000 in cash and a jar containing approximately another $39,000. Upon leaving the yard, Hall followed Lanter and Sterkis first to the Clark station, then to the Venture Store parking lot, where he waited with his receiver tuned to Lanter's transmitter. In the glove compartment of Hall's vehicle was a loaded 9mm Luger. Suffice it to say that substantial evidence exists from which the jury could infer that Hall knew of and joined the charged conspiracy.

■ Hall also contests the enhancement of his sentence under U.S.S.G. § 3B1.1(b). That section provides for a three level increase in a defendant's base offense level if he "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." Application of this guideline is unquestionably proper "if the defendant was a manager, i.e. exercised some control over others involved in the criminal scheme, and the scheme involved five or more people." *Goines,* 988 F.2d at 778. *See also United States v. Cantero,* 995 F.2d 1407, 1414 (7th Cir.1993); *McGuire,* 957 F.2d at 316. However, we agree with the Fourth Circuit Court of Appeals that, "although a defendant did not supervise people, his extensive management responsibilities over property, assets, or activities of the criminal organization [can] justif[y] increasing his offense level pursuant to § 3B1.1(b)." *United States v. Chambers,* 985 F.2d 1263, 1268 (4th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 107, 126 L.Ed.2d 73 (1993).

■ The evidence shows that Hall, with his brother Will, purchased kilogram quantities of cocaine in Chicago for distribution to lower level dealers. James Harris, himself a distributor, testified that he bought cocaine from Aaron on "several occasions." Tracy Vinson, another distributor, obtained cocaine from Aaron. With regard to the five kilogram deal, Aaron endeavored to help his brother procure half the payload. Lanter entrusted to Aaron the means of monitoring his conversations at the Venture Store lot, obviously to provide protection and assistance if such were needed. Thus, while the evidence of Hall's control over others involved in the conspiracy may appear slight, it is clear that he and his brother were partners in distributing sizable amounts of cocaine, and that he was the defendant most responsible for providing security to Lanter at the Venture Store lot. The district court's finding that Hall's role in the conspiracy warranted an enhancement under § 3B1.1(b) is not clearly erroneous.

Hall also objects to the district court's refusal to grant a mistrial based on the statements of prospective juror James. That argument fails for the reasons set forth above. His other claims of error do not require discussion.

*Ronald Flaugher*

■ Flaugher challenges the sufficiency of the evidence for his conspiracy conviction. Specifically, he claims that the government presented no evidence showing that he knew of the conspiracy or committed an act in furtherance of it. We disagree. Early on, Lanter informed Sterkis that Flaugher was a source of drug money. Later, Lanter convinced Flaugher to put up $50,000 toward the purchase of five kilograms of cocaine. On the day of the deal, Lanter told Sterkis he had to meet Flaugher at a Hardee's restaurant to get the money. When Sterkis and Lanter arrived at the restaurant, Lanter visited with Flaugher in his car and returned with a bag containing $50,000 in cash. This is more than sufficient evidence from which the jury could infer that Flaugher knew of the conspiracy and joined it.

Flaugher also complains that there was insufficient evidence to convict him of carrying a firearm in relation to a drug trafficking offense under 18 U.S.C. § 924(c), but, like Will Hall, he is guilty of that crime under the *Pinkerton* doctrine. He objects to the handling of the prospective juror James affair, but that claim necessarily fails. We have considered his other arguments; they are meritless and need not be addressed.

### III.

The convictions and sentences of John Lanter, Joseph Carson, Aaron Hall, and Ronald Flaugher are AFFIRMED. The conviction of Wilbert Hall is AFFIRMED, but his sentence is VACATED and his case REMANDED to the district court for resentencing.